**[Cite as *State v. Uchyn*, 2026-Ohio-58.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-4 |
| Appellee | : | |
| | : | Trial Court Case No. 23CR00085 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| ADAM J. UCHYN | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on January 9, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Mary K. Huffman*

MARY K. HUFFMAN, JUDGE

TUCKER, J., and HANSEMAN, J., concur.

STEVEN H. ECKSTEIN, Attorney for Appellant
DEBORAH S. QUIGLEY, Attorney for Appellee

HUFFMAN, J.

{¶ 1} Adam Uchyn appeals from his convictions of two counts of murder and one count of grand theft of a motor vehicle. For the reasons that follow, the judgment of the trial court is affirmed.

**Facts and Procedural History**

{¶ 2} On April 27, 2023, Uchyn was indicted on two counts of aggravated murder and one count of aggravated robbery. A jury convicted Uchyn of the lesser included offenses of two counts of murder and grand theft of a motor vehicle. The victims of the murder counts were Michele "Shelly" Phipps and James Donnelly. Disposition occurred on January 30, 2025, and Uchyn timely appealed.

*Background and Initial Investigation of the Murders*

{¶ 3}  Before reviewing Uchyn's assigned errors, we review the evidence adduced at trial. The events giving rise to this matter occurred on April 13, 2023. Witness Steven French testified that he and his wife lived next door to Phipps and Donnelly on Weavers-Fort Jefferson Road in Darke County. French and his wife had lived next to Phipps for years, having moved into their home before Donnelly started living with Phipps. According to French, Donnelly assumed responsibility for the home, which Phipps owned, doing the cooking, maintenance, and errand running. Phipps paid for almost all expenses, having received a large settlement in a previous divorce.

{¶ 4} French believed that Phipps and Donnelly were alcoholics. He had seen them intoxicated several times and had observed empty bottles and cans of alcohol in their trash. He stated that Donnelly had been trying to stop drinking in the last two years due to liver issues and other health problems. French occasionally heard arguing from Phipps's home in the summer. Donnelly would sometimes leave for short periods of a few days and then return, but he was mostly present at the home.

{¶ 5} Uchyn had been living at the home with Phipps and Donnelly for about two years at the time of the murders, and French had contact with him four or five times. French indicated that most of the times when he had spoken with Uchyn, he perceived that Uchyn was under the influence of illegal drugs. French knew that Uchyn had been injured in a serious car accident.

{¶ 6} On April 13, 2023, French was mowing his yard, and he saw Donnelly in Phipps's yard. The two of them began talking at a shared fence. Donnelly was "in a really good mood," "definitely sober," and about to cut the grass. Donnelly seemed "fine, probably as good as [French] had seen him in a while," and they spoke for 10-15 minutes. French's wife came outside and gave Donnelly some coffee cake, wrapped in foil, which Donnelly took inside his home.

{¶ 7} After about 20 minutes, French saw two deputies respond to Phipps's home. He did not see Donnelly emerge or depart from the residence. But he did see Uchyn speak to the officers and then drive away in Phipps's white Equinox five minutes after the deputies left.

{¶ 8} One of those deputies, Stephen Strunk, testified that at around 6:39 p.m., he and Deputy Crumley of the Darke County Sheriff's Office responded to Phipps's home after a 911 "hang up" call was placed from the residence. Strunk did not know who placed the

call. The 911 recording was played for the jury, and a female caller was heard providing her address and saying "stop" before the call was abruptly terminated.

{¶ 9} Upon arrival at Phipps and Donnelly's home, Strunk observed Uchyn exiting the rear porch area and walking towards the garage. Strunk called out to Uchyn, and they spoke. Portions of the cruiser camera recordings of their conversation were played at trial. Uchyn told deputies that he had arrived at the home, where he resided with his cousin (Phipps), and found Donnelly in his room stealing his deceased mother's jewelry. He described Donnelly as his cousin's boyfriend and a "meth-head," and he stated that Donnelly hit him in the face with his fist. Uchyn told Strunk that he and Donnelly then fought in the hallway. Uchyn claimed to have called 911 on his cousin's phone and screamed "help, help," but Donnelly grabbed the phone from him. Uchyn told Strunk that he chased Donnelly out of the house, and Donnelly fled with the jewelry to a Camry parked on the street. Uchyn alternatively described the Camry as silver, brown, and tan. Uchyn said that during the fight, he "busted [Donnelly's] fucking nose," and he stated that blood visible on his shoes was Donnelly's. He told the officers that his cousin was out of town.

{¶ 10} The officers observed a bruise on the left side of Uchyn's forehead and blood on his shoes, but no visible cuts or lacerations on his person. Strunk photographed Uchyn, and the officers left the scene.

{¶ 11} Around 5:00 a.m. the following morning, Jenny Buechler, Uchyn's girlfriend, and her friend Ashley Mitchell went to the Darke County Sheriff's Office, as they had recordings regarding the 911 call from the previous night that they wanted Deputy Rodney Baker to hear. Buechler and Mitchell went outside the sheriff's office to smoke. Baker went outside to look for the women, but they had left. Sergeant Colton Magel overheard Baker's conversation with the women and asked Strunk and Crumley about their response to

4

Phipps's home on the previous day. He instructed the deputies to locate and stop the women's vehicle so they could speak further.

{¶ 12} Strunk and Crumley stopped Buechler and Mitchell on Weavers-Fort Jefferson Road, and they returned to the Sheriff's department for an interview with Baker. Buechler and Mitchell provided Deputy Baker with recordings of two conversations between Uchyn and Buechler that Mitchell had recorded and three voicemails left by Uchyn on Buechler's phone, all of which were played at the trial.[1]

{¶ 13} After briefly pausing at the vehicle stop of Buechler and Mitchell, Sergeant Magel and Crumley proceeded to Phipps's home where they met with Sergeant Detective Christopher Clark. Looking through a window of the house, Clark observed blood smears on the wall and a person, Donnelly, covered in blood on the floor. The three officers forced entry through the back door to look for other possible victims. Clark confirmed that Donnelly was deceased. Crumley and Magel then entered through the front door of the home, and Clark joined them. The officers documented their footwear so as not to contaminate the crime scene.

{¶ 14} Clark discovered Phipps's body in her first-floor bedroom, and her dog was in the room with her. After determining that no other victims were present, the officers left the

---

1. In the first April 14, 2023 call between Uchyn and Buechler, at 4:22 a.m., Uchyn stated that Donnelly was "f . . . up," Uchyn had never seen him like that before, and Donnelly had demanded money from Phipps. Uchyn said that the driver of the Camry was Donnelly's meth dealer, Donnelly "slit" Uchyn twice with a knife, and Uchyn punched him in the nose three times. Uchyn stated, "I never meant to hurt him that bad." Buechler told Uchyn to go to the police. In the second call, at 5:48 a.m. the same day, Uchyn stated that after punching Donnelly in the face three or four times, Donnelly was "gushing blood," and Uchyn had blood on his shoes, pants, and knuckles. Uchyn said that he had "smashed" Donnelly's nose. In one of the messages to Buechler, on April 13, 2023, at 8:37 p.m., Uchyn stated that he "f . . . up" and that he got into a fight with Donnelly, who was "methed out." Uchyn said that Donnelly was waiving a knife at Phipps, and Uchyn "got in the middle of it."

5

home and secured the scene. Clark spoke to Crumley and Strunk about the events of the previous day at the home. Clark also spoke to Baker. He proceeded back to the sheriff's office, prepared a search warrant, and then returned to the residence. Clark testified that he was a drug detective for Darke County for eight years, and he looked around Phipps's home "for any type of narcotics that might be there, to include methamphetamine." He "found no evidence of methamphetamine or the use of methamphetamine upstairs, downstairs, and also in the basement."

{¶ 15} Clark met with Joseph Vanvickle, the chief medical-legal investigator for the Darke County Coroner's Office, and evidence technicians. Vanvickle noted that based on the straight downward flow and pooling of Phipps's blood into her bed, her body appeared not to have moved at all after her incapacitating injury.

{¶ 16} In the kitchen, there were upturned chairs, boxes with blood on them, and canned goods scattered throughout, all of which suggested that a lot of movement had occurred. There were also multiple blood smears and blood drops, and there was blood on the refrigerator. A teacup containing a tea bag was found on the counter where sugar had been spilled, and a spoon was found on the floor. Coffee cake wrapped in foil was found nearby. A knife block on the kitchen counter identified each knife in the block by name, and the space for the "butcher knife" was empty.

{¶ 17} Clark identified a bloody shirt with numerous holes in the front, back, and neck areas belonging to Donnelly, which was found three feet from his body. A can of diced tomatoes was found inside the shirt. Donnelly's body was shirtless, and he was wearing jeans and one slipper.

{¶ 18} In Uchyn's unlocked second-floor bedroom, deputies found a butcher knife on a blue pillow on top of a laundry basket and a knife sharpener on the bed. A bedroom across

6

the hall from Uchyn's was padlocked. After gaining entry to the locked bedroom, Clark found a bed, paperwork bearing Uchyn's name, and a "Last Will and Testament" on top of the bed.

*Uchyn's Arrest and Follow-Up Investigation*

{¶ 19} The parties stipulated that on April 14, 2023, the Chicago Police Department coordinated with the OnStar Corporation to obtain the location of Phipps's Equinox. OnStar located and disabled the vehicle at 6449 South Langley Street. Chicago Police set up surveillance at that location and arrested Uchyn. Clark went to Chicago and collected property that Uchyn had on his person at the time, which included his wallet. Uchyn's wallet contained Phipps's Bank of America Visa card, Phipps's key fob, and audio recordings of phone conversations Uchyn made while in Chicago. Clark also collected Uchyn's shoes, jeans, shirt, a backpack, his identification, and two receipts for $400 Walmart Visa gift cards that had been purchased with Phipps's credit card. Only one of the gift cards was found.

{¶ 20} Clark obtained search warrants for the cell phones of Uchyn and Buechler. The analysis of those devices yielded numerous messages relevant to what had transpired between Uchyn, Donnelly, and Phipps. In messages between Uchyn and his father in October 2022, Uchyn stated that Phipps wanted him to move out, that he hated staying at her home, and that Phipps was "pushing me out because they might move to Florida before winter." Another message to Uchyn's father from that same time period stated, "I need out. I can't take this house. I feel like I'm in prison with a cell mate I want to beat up daily." In a March 2023 message, Uchyn told his aunt Cathy that Phipps "told me yesterday she is going to go to court to have me evicted." In another March 2023 message, Uchyn said to his sister Amber, "I am moving into my new place at the end of the month." In a third March 2023 message, Uchyn said to his father, "I bet we're trying to find a place cause Shelly wants her house." In an April 11, 2023 message to Phipps, Uchyn texted, "Yes Shelly, I am trying to

7

finish this place to move in. I'll be home to start packing today or tomorrow." In a message the following day, Uchyn texted Phipps, "I am coming tonight."

{¶ 21} Clark identified an April 13, 2023 instant message from Uchyn to Buechler, time stamped 2:58 p.m., that stated, "Yeah, I snapped on both of them and then laid down before I blew up on both of them and did what I said I was going to do to them because I almost went there." At 7:24 p.m. that day, Uchyn texted Buechler, "Call me ASAP, babe, I am F literally though[]."

{¶ 22} Clark identified a three-part instant message from Uchyn to Buechler at 3:44 a.m. on April 14, 2023, in which Uchyn stated that Donnelly "came at me with his f****** filet knife, decided he was going to f****** cut me." In the second part of the message, Uchyn stated that he "defended [himself]," and that Donnelly had tried to rob Phipps, who refused to give him any money. The third part of message stated that Donnelly was waving a knife at Phipps and "[e]nded up stabbing her," and Uchyn "jumped into the f****** middle and ended up getting stabbed twice."

{¶ 23} In a subsequent message the same morning of April 14, 2023, Uchyn texted Buechler: "Cuz I tell you like this I've got that f****** gun on me and if they try to pull me over I'm not f****** going out I'm not going . . . to prison." (Ellipsis in original exhibit.) A second part of this message stated, "[S]o if you can just wait till you get off of work and say that you were supposed to pick me up and you found them." Finally, another message at 3:45 a.m. said, "I love you and I wish u wouldn't called the cops on me."

{¶ 24} Clark retrieved recordings of Uchyn discussing the incident on the phone in the jail in Chicago, and those were played for the jury. In the recordings, Uchyn again described Donnelly as "methed out" and demanding money from Phipps. Uchyn said that Donnelly cut him and that he went "ballistic" and stabbed Donnelly repeatedly.

8

{¶ 25} At trial, Clark testified about his interpretation of the crime scene. He said that he believed the sequence of events began in the kitchen while Donnelly was making tea and about to put sugar in the teacup based on the sugar spilled on the counter and the spoon on the floor. Considering the presence and pattern of blood in the area, it appeared to Clark that Donnelly was interrupted, and Uchyn stabbed him in the left side of his back. According to Clark, the amount of blood on the floor by the chairs and on the kitchen island indicated that Donnelly proceeded around the counter area to the other side while continuing to lose blood, at which time he was stabbed again.

{¶ 26} Clark explained that at that point, based on the evidence, Phipps called 911 from her bedroom, and Uchyn proceeded to that location based on shoeprints in the direction of her room and on the right side of her bed. Uchyn stabbed Phipps twice, causing her to die instantly. Uchyn then climbed over the bed, where a shoeprint was found on the left side headed into the hallway. Based on blood found on the hallway wall and floor, Uchyn stabbed Donnelly again in that area. Both men then returned to the kitchen and finally went to the area where Donnelly's body was ultimately found.

*Forensic Evidence*

{¶ 27} Sergeant Tony Royer of the Darke County Sheriff's Office testified that he collected evidence at Phipps's home. This included a Greenville National Bank envelope with dried blood on it located in Phillips's open purse in her bedroom and the knife sharpener found in Uchyn's bedroom.

{¶ 28} Deputy Aaron Wood collected blood swabs at the scene, including from the nightstand at the foot of Phillips's bed, a hallway wall near Phipps's bedroom, and the kitchen bar area of the home. Wood also collected both of Donnelly's shoes and his bloody shirt containing the can of diced tomatoes.

{¶ 29} Deputy Jamie Joseph of the Darke County Sheriff's Office collected Uchyn's Fruit of the Loom sweatpants and a Bass Pro Shop T-shirt that were found in Uchyn's upstairs bedroom. Joseph also collected the butcher knife that was found on a pillow on top of a laundry basket in the same bedroom.

{¶ 30} Multiple witnesses for the State were qualified as experts, provided reports, and testified to a reasonable degree of scientific certainty regarding their conclusions. Logan Schepeler, a forensic scientist in the DNA section of the Ohio Bureau of Criminal Investigation ("BCI"), analyzed items collected from the crime scene for the presence of DNA. Schepeler received DNA standards from Phipps, Donnelly, and Uchyn. He tested stains on Uchyn's left shoe, a nightstand in Phipps's bedroom, the floor by Phipps's bed, the hallway wall outside Phipps's bedroom, the sweatpants and T-shirt worn by Uchyn, and the kitchen bar. Schepeler's analysis of these stains revealed that they were presumptively positive for the presence of blood. Schepeler obtained a DNA profile from the stains consistent with Donnelly's DNA, with an estimated frequency of occurrence rarer than one in one trillion unrelated individuals. Schepeler excluded Phipps and Uchyn as the source of the DNA profile in the stains.

{¶ 31} Schepeler tested the butcher knife and found a mixture of DNA on the blade. He determined that the DNA profile of the major contributor—the source of the majority of the DNA in the sample—was consistent with Donnelly's DNA. Schepeler also tested a stain on the handle of the knife. He obtained a single DNA profile that was consistent with Donnelly's DNA. Schepeler calculated that the estimated frequency of occurrence of an unrelated person's DNA as the major contributor to the DNA profile on the blade and the DNA profile on the handle was one in one trillion unrelated individuals. Schepeler excluded Phipps and Uchyn as the source of the DNA profile on the knife.

10

{¶ 32} Daniel Davison, a forensic scientist formerly employed at BCI in the trace evidence section, performed footwear analysis of Uchyn's and Donnelly's shoes and footwear impressions from the crime scene. Davidson was able to compare five impressions. He concluded that they could have been made by Uchyn's shoes and could not have been made by Donnelly's shoes.

{¶ 33} Matthew Juhascik, Ph.D., chief forensic toxicologist at the Montgomery County Coroner's Office and Crime Lab, testified about the toxicology analysis of Phipps's bodily fluids that was performed in connection with her autopsy. The analysis revealed no drugs and the presence of alcohol at a level not indicative of intoxication. A similar toxicology analysis of Donnelly's bodily fluids revealed an absence of alcohol or stimulants, the presence of Benadryl, and "an extremely small amount" of fentanyl.

{¶ 34} Kevin Jenkins, M.D., a forensic pathologist at the Montgomery County Coroner's Office, performed Phipps's and Donnelly's autopsies. He concluded that Phipps's cause of death was multiple sharp force injuries, specifically to the right anterior neck, strap muscles of the neck, carotid artery, jugular vein, and C7 and T1 vertebrae at the bottom of the neck and the spine. Phipps also suffered a defensive wound to her left hand. Jenkins testified that the blow on the right side of Phipps's neck was fatal, causing her to die within seconds.

{¶ 35} Donnelly's cause of death was also multiple sharp force injuries. His injuries were more extensive than Phipps's, numbering over 40 in total. Donnelly's wounds intersected and crossed over each other and were within each other, and multiple photos of the injuries were shown to the jury. Donnelly had defensive injuries to his hands. Jenkins did not observe any injuries to Donnelly's face suggesting that he had been punched. The interval between Donnelly's injuries and death was minutes based on the blood found in

11

multiple areas of the home. Jenkins stated that one group of injuries caused severe damage to muscles in Donnelly's neck. The damage was close to decapitating, although the bone was not severed.

*Evidence Presented by Uchyn*

{¶ 36} Casson Reynolds, an expert in blood stain pattern analysis, testified on behalf of Uchyn. He stated that the photos of the scene were of poor quality and taken in a "nonmethodical way." According to his testimony, the integrity of the crime scene was compromised by the presence of a dog and the officers' initial entry into the home to clear the scene. Reynolds stated that the fact pattern presented by Clark was "not founded in any scientific analysis," and that while it was "certainly possible that what is in the report happened . . . there is no scientific validity for anything that was stated." Reynolds stated that there was "no way for us to determine who was assaulted first," either Phipps or Donnelly, and "no way for us to determine who was the aggressor in this—based off the photographs or the actions." Reynolds opined that the sequence of events could not be determined based on the blood stains, the patterns, and his observations, nor could it be determined who wielded the knife.

{¶ 37} Uchyn testified that he was previously employed in commercial construction in Chicago, and in 2021, he came to Darke County to work with his cousin Erik to remodel houses. Uchyn acknowledged a previous drug problem. Phipps and Erik were also cousins, and although Uchyn was not related to Phipps, he referred to her as his cousin. Uchyn moved into Phipps's home, where Erik also resided.

{¶ 38} Two weeks after Uchyn moved in, Donnelly returned to the home. Erik and Donnelly did not get along and often argued, and Uchyn broke up a couple of fights between them. In the two weeks before Donnelly moved back in, Phipps consumed approximately a

12

six-pack of beer a day. But after Donnelly returned, Phipps's drinking "became progressively worse." According to Uchyn, Phipps and Donnelly were "drinking buddies. When one drank, the other drank," and they often argued. When drinking, Donnelly "would scream and yell" at Phipps.

{¶ 39} Uchyn observed Donnelly smoking methamphetamine in the home. Uchyn described Donnelly's behavior as "sporadic, erratic," and paranoid, and he characterized Donnelly as irate when using drugs. After an argument between Erik and Donnelly, Phipps told Erik to leave her home, and he did so in November 2021.

{¶ 40} Uchyn was subsequently cited for OVI, and as a result of a urine test, he was indicted for drug possession. The incident occurred, according to Uchyn, after he offered a ride to two women outside a Walmart. He later learned from "reading reports" that he was found on the side of the road with his "jewelry" missing and his pockets empty. "[F]rom what [he] was told," the women let him go, he got back into his car, and he "crashed and broke [his] spine and almost died." Uchyn required surgery and was hospitalized for several days.

{¶ 41} Uchyn had no income and borrowed money from his dad and sister. As part of his OVI case, Uchyn was required to attend and complete recovery-oriented programs and probation appointments. He paid Donnelly to transport him with money from his father. Uchyn was unable to do any of the work around Phipps's home as a result of his injuries, and his relationship with Donnelly was "up and down," with Donnelly accusing him of failing to help around the home.

{¶ 42} In early 2022, Uchyn began a relationship with Buechler. Uchyn observed that Donnelly's "drug addiction was more progressive," and he fought more with Phipps at the time. Uchyn also fought with Donnelly because "[Donnelly] knew he can get away with a lot more stuff coming at [Uchyn]." Donnelly once threatened to hit Uchyn with a hammer, and

13

he left a hammer in view on the kitchen island. In the summer of 2022, Donnelly twice threatened Uchyn with a filet knife in the kitchen, and there were other threats of physical harm. Uchyn once observed Donnelly going through Phipps's purse in her bedroom while Phipps was "passed out in the bed," and Phipps occasionally reported being unable to find her money.

{¶ 43} Buechler moved into Phipps's home on October 1, 2022, and she began to transport Uchyn to his appointments. After the arguments between Uchyn and Donnelly began to cause a strain on Phipps and at Donnelly's urging, Phipps asked Uchyn to move out of her home. Later in October 2022, Uchyn and Buechler began working at Fram, an oil filter manufacturer.

{¶ 44} Uchyn and Buechler had difficulty finding a place to live, and they began paying rent to Phipps while they continued to look for housing, asking to remain in her home for another six months. Uchyn repeatedly advised his probation officer of the problems in the home, but he did not contact the police due to fear of Donnelly. At his probation officer's suggestion, Uchyn contacted Adult Protective Services anonymously and reported the alleged "elderly abuse" of Phipps by Donnelly. Specifically, Uchyn reported that Donnelly physically abused Phipps. Uchyn began to take videos inside the home, and he told "neighbors," his "Aunt Cathy," "everybody I could," of the ongoing abuse.

{¶ 45} Uchyn indicated that in January 2023, he relapsed on drugs, Buechler found him, gave him Narcan, and called his father. Uchyn identified his undated last will and testament, which he read as follows: "I am sorry for what I have done, but the mental torment that I have been through has killed me and made me snap inside. Getting called worthless and a bum has pushed me over the edge. I'm sorry." Uchyn stated that his father had called him worthless and a bum after being contacted by Buechler about his relapse. Uchyn

14

decided to kill himself by means of a heroin overdose, and he said that he wrote the last will and testament before using the heroin. After Buechler, a former nurse, found Uchyn in a downstairs bedroom, she was able to revive him with Narcan received as "part of [his] recovery and wellness," and a medic was not called. Uchyn stated that he entered an inpatient rehabilitation facility the next day, where he stayed for two weeks.

{¶ 46} When Uchyn returned to Phipps's home, Donnelly and Phipps continued to drink, and Donnelly continued to use drugs. According to Uchyn, someone from Adult Protective Services responded to the home, and he acknowledged at that time that he had made the report to the agency. Phipps went outside to speak to the social worker, did so for three minutes, and then went back inside her home. No further action occurred.

{¶ 47} Uchyn "took many a steps from [repeatedly] driving behind [Phipps], calling 9-1-1 trying to get her pulled over so that at least somebody would have to do something," to help Phipps. Uchyn testified that he loved Phipps and was concerned about her. According to Uchyn, he and Buechler saw Donnelly take Phipps's credit card and leave the home when Phipps was unconscious.

{¶ 48} Uchyn and Buechler entered into a contract for a mobile home on April 1, 2023. At the beginning of March, Uchyn had a workplace accident at Fram where he refractured his spine. After another argument with Donnelly, Uchyn moved into the mobile home around April 10, 2023, and he advised Phipps that he would pack his things at her home.

{¶ 49} On April 13, 2023, Uchyn had appointments at Reid Hospital in Richmond, Indiana, for an MRI and a CAT scan, and Buechler drove him there. Afterwards, Buechler took Uchyn to Phipps's home around noon to pack his belongings, and she asked him to retrieve medication for their dog. When Uchyn entered the home, Donnelly "was in the kitchen to the right talking to the stove" in an incoherent manner. Uchyn suspected Donnelly

15

"was methed out." Uchyn went past Donnelly and upstairs to get the dog's medication, and he took it outside and gave it to Buechler.

{¶ 50} Uchyn then prepared to do laundry because there were not a washer and dryer at the mobile home. While downstairs, Uchyn could hear Phipps and Donnelly arguing in Phipps's bedroom after Donnelly requested money from Phipps and she refused to give it to him. He heard slamming doors and Donnelly storming out of the house.

{¶ 51} Uchyn went back upstairs and told Phipps that Donnelly was using her. Donnelly returned home, Uchyn confronted him, and they shoved each other in Phipps's room. Uchyn returned upstairs and emptied his pockets, removing several items including a knife sharpener that he used while cutting drywall at the mobile home. He then got undressed and took a nap.

{¶ 52} Uchyn was awakened to slamming doors and arguing between Phipps and Donnelly. He eventually heard Phipps scream "get away from me," and he got dressed and went downstairs. Uchyn found Phipps "laid across the back of [her] bed" and Donnelly "standing at the end of the bed" going through her purse. Uchyn confronted Donnelly. Donnelly raised his arm and revealed the butcher knife.

{¶ 53} Donnelly pursued Uchyn, and in the kitchen, he brought the knife down in a "chopping motion." Uchyn detailed a struggle over the knife, with both men falling to the floor. Uchyn was enraged, having seen blood on Phipps. Uchyn described the part of the fight where he stabbed Donnelly. Uchyn testified that he grabbed Donnelly by his shirt and began "upper cutting him in the face." Uchyn stabbed Donnelly "I don't know how many times." Uchyn stated that at one point he was "trying to hold [Donnelly] up" by his shirt until he fell in the area where his body was found. Uchyn pulled the shirt off as Donnelly fell.

16

{¶ 54} Uchyn found Phipps unresponsive and "freaked out." He ran upstairs, washed his hands, put the knife where it was found, and changed his clothes. Afterwards, Uchyn went outside and spoke to the deputies. At trial, Uchyn acknowledged that he had lied to them. Uchyn testified that after he spoke to the deputies, he went back inside, located Phipps's car keys and credit card in Donnelly's pocket, and fled. He first intended to drive to Florida, but then he headed to Chicago.

{¶ 55} Uchyn denied killing Phipps. In acknowledging killing Donnelly, Uchyn stated that he did so because "he hurt the woman that I was trying to protect from that man. Second of all, he came at me and tried to take my life. If that don't make you in a rage, I don't know what will."

**Assignments of Error and Analysis**

*Conviction for Murder of Phipps*

{¶ 56} Uchyn raises three assignments of error. In his first assignment of error, he claims that his conviction for Phipps's murder is not supported by sufficient evidence. According to Uchyn, "the scientific evidence presented excluded the deceased female from all clothing" worn by him, and there was no evidence that he "ever threatened to kill her." Uchyn asserts that "in all of the statements and recordings, [he] never indicated that he killed [Phipps]" and that his fingerprints were not found on the handle of the knife.

{¶ 57} Although the State does not raise this issue, defense counsel failed to renew his motion for acquittal at the close of all the evidence at trial. Uchyn's motion for acquittal at the close of the state's case-in-chief was denied, and then counsel presented the testimony of Reynolds and Uchyn. Uchyn "therefore has failed to preserve his sufficiency argument by not renewing it at the close of evidence." *State v. Goney*, 2018-Ohio-2115, ¶ 71 (2d Dist.), citing *State v. Zimpfer*, 2014-Ohio-4401, ¶ 42 (2d Dist.) (appellant preserved his

17

insufficiency argument by making an unsuccessful Crim.R. 29 motion for acquittal at the close of evidence at trial). "It is generally accepted in Ohio that if counsel fails to make and renew a Crim.R. 29 motion during a jury trial, the issue of sufficiency is waived on appeal." *Id.,* citing *State v. Richardson*, 2016-Ohio-8081, ¶ 16 (2d Dist.). Even if Uchyn had renewed his motion, however, his argument that his conviction for Phipps's murder was based upon insufficient evidence fails.

**{¶ 58}** Crim.R. 29(A) states that a court shall order an entry of judgment of acquittal if the evidence is insufficient to sustain a conviction for the charged offense. "'Reviewing the denial of a Crim.R. 29 motion therefore requires an appellate court to use the same standard as is used to review a sufficiency of the evidence claim.'" *Goney* at ¶ 72, quoting *State v. Witcher*, 2007-Ohio-3960, ¶ 20 (6th Dist.). A sufficiency of the evidence argument relates to whether the State "presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). "In essence, sufficiency is a test of adequacy. Whether the evidence is sufficient to sustain a verdict is a question of law." *Thompkins* at 386.

**{¶ 59}** The test for sufficiency of the evidence was set forth in *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the

18

prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

In other words, on review for sufficiency, courts are to assess not whether the State's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction. *Thompkins* at 390.

{¶ 60} R.C. 2903.02(A) proscribes murder and states: "No person shall purposely cause the death of another . . . ." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶ 61} It is undisputed that three people were in the home when Donnelly and Phipps were murdered, and only Uchyn survived. Uchyn acknowledged killing Donnelly, and though he suggested that Donnelly killed Phipps in a drug-fueled rage after she refused to give him money, the State's evidence, if believed, supports Uchyn's conviction for the murder of Phipps.

{¶ 62} According to French, Phipps's longtime neighbor, Donnelly and Phipps had an ongoing mutually beneficial relationship where Donnelly maintained Phipps's home. Consistent with French's testimony, Uchyn acknowledged that in addition to allowing Donnelly to live in her home, Phipps routinely provided money to Donnelly. On the day of the murders, a "definitely sober" Donnelly, who was "fine" and in a "really good mood," prepared to cut the grass. No signs of methamphetamine usage were found in the home. French said that he and Donnelly had a conversation, during which French's wife brought Donnelly a coffee cake. Donnelly took the coffee cake inside, and twenty minutes later,

19

French saw deputies respond to Phipps's home. Five minutes after that, French saw Uchyn leave in Phipps's vehicle.

**{¶ 63}** Regarding Phipps's relationship with Uchyn, although Uchyn claimed to have protected her and that Donnelly was responsible for forcing Uchyn to leave Phipps's home, Phipps, as the homeowner, had sole authority to make such a demand. The text messages that were admitted in the State's case suggest that Uchyn resented Phipps and reveal an ongoing tension between them. In the messages, Uchyn referred to Phipps alone as the person who wanted him out. Uchyn said that Phipps was pushing him out, that she had told him that she was going to go to court to evict him, and that she wanted "her" house back. Uchyn responded to Phipps, not Donnelly, that he was "trying to finish this place to move in," and he told her when he would retrieve his things from her home. On April 13, 2023, the day of the murders, Uchyn's text to Buechler acknowledged that he "snapped" on *both* Phipps and Donnelly and took a nap before doing what he had previously threatened to do to *both* of them. After both were dead, Uchyn fled the scene, repeatedly and admittedly lied about the incident, and expressed concern about going to prison for his actions.

**{¶ 64}** Even in the absence of Uchyn's fingerprints on the handle of the knife, the sequence of events, as interpreted by Sergeant Detective Clark, accounted for the evidence at the scene, including the shoe impressions and blood patterns throughout the home. The 911 call was placed by a female. Although Uchyn had ongoing physical contact with Donnelly as they fought, allowing for the transfer of Donnelly's blood to Uchyn's clothing, Phipps bled straight down into her bed upon injury and died instantly, negating a similar transfer of DNA to Uchyn. Uchyn's expert witness, Reynolds, acknowledged that the events could have occurred in the manner Clark described, namely that Uchyn attacked Donnelly

20

first as he made tea in the kitchen and then killed Phipps when she called 911 for help from her bedroom.

{¶ 65} Viewing the evidence in a light most favorable to the State, the State's evidence, if believed, meets the legal standard of murder, establishing that Uchyn purposely caused Phipps's death. Uchyn's first assignment of error is accordingly overruled.

*Conviction for Murder of Donnelly*

{¶ 66} In his second and third assignments of error, Uchyn argues, respectively, that his conviction for Donnelly's murder is not supported by sufficient evidence and is against the manifest weight of the evidence. He asserts that he "put forth sufficient evidence by a preponderance of the evidence that would have allowed the jury to find him guilty of Voluntary Manslaughter, as he testified he was provoked by [Donnelly's] killing of [Phipps]." According to Uchyn, if his conviction for the murder of Phipps was based upon insufficient evidence, "then he is also correct that his conviction for the murder of [Donnelly] is based upon the jury's improper disregard of [this] mitigating circumstance."

{¶ 67}  As noted above, on review for sufficiency of the evidence, we assess whether, if believed, the evidence against Uchyn supports a conviction. A weight of the evidence argument, on the other hand, challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive. *State v. Wilson,* 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v. Hufnagel*, 1996 WL 501470, *3 (2d Dist. Sept. 6, 1996). The proper test to apply to a manifest weight of the evidence inquiry is set forth in *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983): "[T]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury lost its way and created such a manifest miscarriage of justice that the conviction

21

must be reversed and a new trial ordered." "In order to find that a manifest miscarriage of justice occurred, an appellate court must conclude that a guilty verdict is 'against,' that is, contrary to, the manifest weight of the evidence presented." *Wilson* at ¶ 14.

{¶ 68} However, "[a]lthough sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Flores-Lopez*, 2017-Ohio-690, ¶ 49 (2d Dist.), citing *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.); *accord State v. Robinson*, 2015-Ohio-1167, ¶ 17 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." *Flores-Lopez* at ¶ 49, citing *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

{¶ 69} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact primarily to resolve. *Wilson* at ¶ 15, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967). In *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997), we explained:

> Because the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

{¶ 70} Additionally, the trier of fact is in the best position to consider inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses'

22

testimony is credible. *State v. Petty*, 2012-Ohio-2989, ¶ 38 (10th Dist.), citing *State v. Williams*, 2002-Ohio-4503, ¶ 58 (10th Dist.). "To that end, the fact finder is free to believe all, part or none of the testimony of each witness appearing before it." *Id*., citing *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). "Mere disagreement over the credibility of witnesses is not sufficient reason to reverse a judgment." *Id*., citing *State v. Wilson*, 2007-Ohio-2202, ¶ 24. Moreover, "[i]t is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C*., 2015-Ohio-820, ¶ 35 (12th Dist.). Thus, we will not substitute our judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *See Wilson*, 2009-Ohio-525, at ¶ 17 (2d Dist.), citing *State v. Bradley*, 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997).

**{¶ 71}** R.C. 2903.03(A) proscribes voluntary manslaughter and states: "No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another . . . ."

**{¶ 72}** Having found that Uchyn's conviction for the murder of Phipps was supported by sufficient evidence, and after reviewing the entire record and weighing all reasonable inferences, the record does not support the conclusion that the jury lost its way in finding Uchyn guilty of Donnelly's murder. The court provided the jury with an instruction on voluntary manslaughter as to Donnelly's death, and the jury was free to consider the elements of that charge. Ultimately, the jury rejected that alternative and instead found him guilty of the lesser included offense of murder, rather than the indicted offense of aggravated murder. Because the jury considered the voluntary manslaughter charge as to Donnelly's

23

death but convicted Uchyn of the lesser included offense of murder, and because we must defer to the jury's determinations of credibility, we cannot say that the jury lost its way and created a manifest injustice.

{¶ 73} Further, we find it necessary to comment on the record before us that reflects Uchyn's abject lack of believability. Uchyn falsely told deputies Crumley and Strunk that he found Donnelly stealing his deceased mother's jewelry, that he placed the 911 call, that Phipps was out of town, and that Donnelly fled in a Camry. Uchyn provided multiple descriptions of the color of the Camry. Uchyn also testified that he had previously been robbed of his jewelry. He gave a vague account of the incident suggesting that he had been blamelessly drugged by two women to whom he had given a ride, which led to him crashing his car and being charged with drug possession and OVI. Uchyn's claims also starkly contrasted the physical evidence. Uchyn told Crumley, Strunk, and Buechler that he punched Donnelly in the nose and face repeatedly. But no such injuries were visible on Donnelly's face the following day at autopsy. Uchyn asserted that Donnelly had stabbed him twice, but there were no corresponding injuries. Uchyn testified at length about his concern for Phipps due to Donnelly's alleged ongoing abuse, but none of the testimony was corroborated in any way by his probation officer, representatives from Adult Protective Services who allegedly responded to the home, or any of the numerous people with whom Uchyn claimed to have shared his concerns. In a text message, Uchyn asked Buechler to lie that she found Phipps's and Donnelly's bodies at Phipps's home. Finally, Uchyn testified that after being disparaged by his father and prior to attempting suicide, he wrote the undated last will and testament in which he expressed remorse and acknowledged "snapping." The jury could have reasonably inferred that Uchyn wrote the inculpatory

document after the murders but before he fled the scene, and that he then concocted the story about his suicide attempt to explain the document's presence in the home.

{¶ 74} Uchyn's conviction for the murder of Donnelly is supported by sufficient evidence and not against the manifest weight of the evidence. His second and third assignments of error are overruled.

## Conclusion

{¶ 75} Having overruled Uchyn's three assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and HANSEMAN, J., concur.